**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JUDGE STANTON

| | |
|---|---|
| SANJU SHARMA, Individually and On Behalf of All Others Similarly Situated, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| vs. | )<br>) |
| TOWER GROUP INTERNATIONAL, LTD., MICHAEL H. LEE and WILLIAM E. HITSELBERGER, | )<br>)<br>)<br>) |
| Defendants. | )<br>) |

CIVIL ACTION NO.

**13 CV 7085**

CLASS ACTION

**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

JURY TRIAL DEMANDED

RECEIVED
OCT 0 4 2013
U.S.D.C. S.D.N.Y.
CASHIERS

Plaintiff Sanju Sharma ("Plaintiff") brings this securities class action pursuant to §§ 10(b)

and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5

promulgated thereunder on behalf of all investors who purchased or otherwise acquired the

common stock of Tower Group International, Ltd. or its predecessor-company, Tower Group,

Inc. ("Tower" or the "Company"), between May 10, 2011 and September 17, 2013, inclusive

(the "Class Period"). The allegations herein are based upon Plaintiff's knowledge with respect to

Plaintiff, and information and belief as to all other matters, based upon, *inter alia*, the

investigation conducted by and through Plaintiff's attorneys, which included, among other

things, a review of the Defendants' public documents and press releases, Tower's public filings

with the United States Securities and Exchange Commission ("SEC"), wire and media reports

published regarding Tower, securities analysts' reports and advisories about the Company,

transcripts of Tower investor conference calls, and information readily obtainable on the Internet.

Plaintiff believes that substantial evidentiary support will exist for the allegations set forth

herein after a reasonable opportunity for discovery.

## I.        NATURE OF THE ACTION

1.        This action arises from Tower's fraudulent understatement of its loss reserves, overstatement of its net income, and related misrepresentations regarding its loss reserve practices and financial results.

2.        Through its subsidiaries, Tower underwrites commercial, personal and specialty insurance and reinsurance products in the Bermuda, United States, and London markets.

3.        Insurance companies like Tower promise policyholders financial compensation if they suffer uncertain losses, in exchange for premiums paid.  Because the collected premium income may be insufficient to pay all claims filed during a certain period, insurers must hold a "loss reserve" which guarantees they can meet their future liabilities.  The total loss reserve for a line of business as of a given date is a liability which should equal the amount of paid loss that will be required to settle all claims which took place prior to that date, not including payments already made.

4.        Loss reserves have a significant impact on an insurer's reported operating results and financial condition.  For every dollar a company establishes as a loss reserve, the company must deduct one dollar from its net income.  Indeed, proper loss expense reserves are vital for an insurance company – both for financial security and for the production of accurate income statements.   Loss reserves are also the key metrics that drives an insurance company's profitability.

5.        Due to its direct impact on reported financial results, securities analysts and Tower investors paid particular attention to Tower's loss reserves in order to evaluate the Company's profitability and stability.  Throughout the Class Period, Tower repeatedly assured these securities analysts and Tower investors that it was regularly conducting "comprehensive

reviews" of its reserves, that its loss reserves were "conservative," and that its financials "fully reflect[ed] current accident year profitability going forward."

6.     Instead of properly and "conservatively" reserving for its losses as it claimed, however, the Company was intentionally understating its losses throughout the Class Period in order to inflate its stock price in anticipation of closing a merger with Canopius Holdings Bermuda Limited ("Canopius"). Specifically, the Company fraudulently failed to record sufficient loss reserves in, among other areas, its U.S. based commercial insurance segments, and thereby inflated its reported income, in order to artificially prop up its stock price. Defendants then used the inflated stock to acquire Canopius.

7.     Closing the Canopius merger was vitally important to the Company and to the Individual Defendants. Tower had been suffering from several challenging years, and needed to both diversify its business out of the Northeastern United States, and take advantage of certain important tax benefits available only in Bermuda that a merger with Canopius would provide. The merger also promised the Individual Defendants millions in vested stock options, new positions in the surviving Company, and the possibility of tens of millions in golden parachute payments.

8.     The Company boasted that the Canopius merger would be the "transformative" change it needed to restore the Company's earnings and growth. Analysts and investors similarly believed the Canopius merger would be very positive for the Company. They believed that the Canopius merger could "accelerate a rebound" by materially lowering the Company's tax rate and "open[ing] the door to more investment opportunities."

9.     Notably, however, an increase in Tower's stock price was a critical factor in the ability of the Company to close the Canopius merger. As Tower executives admitted and

analysts noted, "a rebound in Tower Group's stock price" was "a prerequisite for doing the [Canopius] deal as dilution at the current share price will not be as accretive for current Tower Group shareholders."  Following the Company's second quarter 2012 results – Tower reported relatively stable loss reserves.  By failing to properly reserve for losses – thereby inflating the Company's net income – Defendants were able to artificially increase Tower's stock price from $15.63 per share on July 31, 2013 (the day after the merger was announced) to $17 per share on March 13, 2013 (when the Canopius merger closed).  This artificial inflation in Tower's stock price allowed it to successfully close the Canopius merger.

10.     However, Defendants' loss reserves fraud did not end with the Canopius merger.  On May 9, 2013, shortly after the Company's inflated financial results enabled Tower to complete the Canopius merger, Defendants again falsely claimed that Tower took a "conservative approach" to its reserves and that its loss reserves were adequate.  The Company also reported net income of $15.1 million, which was materially overstated due to the Company's ongoing refusal to establish adequate reserves.  These false and misleading statements regarding the Company's loss reserves caused the Company's stock price to continue to artificially rise.

11.     It was not until two months later that Tower shocked investors by finally disclosing that its reserves were woefully deficient, and that the Company's profitability going forward was in jeopardy.  Specifically, starting on August 7, 2013, after the close of market, the Company disclosed that it was postponing the release of its financial results for the second quarter of 2013 in order to review matters relating to the estimate of its loss reserves, its allocation of goodwill – primarily due to the integration of Canopius Bermuda – and certain tax accounts.

4

12.     The following day, the Company then announced that it would have to unexpectedly increase its loss reserves by $60 to $110 million – turning what was supposed to be a profit for the quarter into a loss of $0.80 to $0.85 per share – and that its goodwill and tax benefits could also be negatively impacted.  Assuming a reserve charge of $110 million, the adverse impact to earnings would be approximately $1.88 per share.

13.     Analysts were stunned by this news, causing them to significantly lower their earnings per share ("EPS") guidance, growth expectations and price targets.  For example, without even taking into account any potential reduction to goodwill, Compass Point lowered its Tower second quarter 2013 EPS estimate from a positive $0.56 per share to a negative ($1.32) per share, lowered their 2013 total year EPS estimate from $2.35 per share to $0.21 per share, and lowered their per share price target from $23 to $20.  Similarly, William Blair lowered its Tower second quarter 2013 EPS estimate from a positive $0.20 per share to a negative ($0.47) per share, and lowered its 2013 operating earnings per share estimate from $2.17 to $1.13.

14.     In response to the Company's August 7 and 8, 2013 disclosures, the Company's subsidiaries were placed under negative review by A.M. Best Company, and the Company received a notification letter from the Nasdaq Listing Qualifications Department ("NASDAQ") stating that the Company was not in compliance with its continued listing requirements.

15.     Then, on September 9, 2013, the Company announced that it would again need to delay the filing of its second quarter of 2013 Form 10-Q, and that it would not be providing any projections regarding when it would file its second quarter of 2013 Form 10-Q.  However, the Company stated that it "expect[ed] to announce on Tuesday, September 17, 2013, the date for its second quarter earnings release and conference call, and the date on which it expects to file its Form 10-Q."

16.     After the market closed on September 17, 2013, the Company stunned investors by announcing that it would again delay the filing of its second quarter results, providing no explanation, saying only that it planned to release its second quarter 2013 financial results during the week of October 7, 2013, as well as its second quarter 2013 Form 10-Q "as soon as practical after it reports its financial results."

17.     Finally, the following morning, Tower was downgraded by FBR Co., which firm downgraded Tower due to the Company's further delay in releasing its 2013 second quarter Form 10-Q.

18.     Overall, in response to these partial disclosures of the fraud, Tower's stock price fell aggregately $7.75 per share, representing a staggering 36% decline in less than two months.

19.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and the other Class members have suffered significant losses and damages.

## II.     <u>JURISDICTION AND VENUE</u>

20.     The claims asserted arise under §§l0(b) and 20(a) of the Exchange Act and Rule l0b-5 promulgated thereunder.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act.  Venue is proper pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Tower has operations in this District, false statements were made in this District, and acts giving rise to the violations complained of occurred in this District.

21.     In connection with the acts alleged in this Complaint, defendants directly or indirectly used the means and instrumentalities of interstate commerce, including without limitation the mails, interstate telephone communications, and the facilities of the national securities exchanges.

III.   **PARTIES**

22.     Plaintiff acquired Tower common stock at artificially inflated prices during the Class Period as described in the attached certification and was damaged thereby.

23.     Defendant Tower is a Bermuda-based insurance and reinsurance holding company that offers commercial, personal and specialty insurance products and services in the U.S. through its U.S. insurance subsidiaries and also offers reinsurance products globally.  On March 13, 2013, Tower Group, Inc, and Canopius Holdings Bermuda Limited and Canopius Holdings Bermuda Limited (collectively, "Canopius") consummated a stock for stock merger ("Merger") by which Tower Group, Inc. became an indirect wholly-owned subsidiary of Canopius, and changed its named to Tower Group International, Inc.

24.     Tower Group, Inc. is the predecessor company of Tower Group International, Inc. (references herein to "Tower" or the "Company" include Tower Group, Inc. and Tower Group International, Inc.).  Prior to the Merger, the Company was incorporated under the laws of the State of Delaware, and was headquartered in New York, New York.

25.     Defendant Michael H. Lee ("Lee") is Chairman of the Board of Directors, President and Chief Executive Officer ("CEO") of the Company.  Between the Company formation in 1995 and the closing of the Merger in March 2013, Lee served as Tower Group, Inc.'s Chairman, President and CEO.  Lee signed the Company's materially false and misleading quarterly reports on Forms 10-Q for the second and third quarters of 2012 and the first quarter of 2013, filed with the SEC on August 8, 2012, November 9, 2012 and May 10, 2013, respectively, and the annual report on Form 10-K for 2012 filed with the SEC on March 4, 2013.

26.     Defendant William E. Hitselberger ("Hitselberger") is Executive Vice President ("EVP") and Chief Financial Officer ("CFO") of the Company.  Prior to the Merger, Hitselberger served as Tower Group, Inc.'s EVP and CFO.  Hitselberger signed the Company's

materially false and misleading quarterly reports on Forms 10-Q for the second and third quarters of 2012 and for the first quarter of 2013, filed with the SEC on August 8, 2012, November 9, 2012 and May 10, 2013, respectively, and the annual report on Form 10-K for 2012 filed with the SEC on March 4, 2013.

27.     Defendants Lee and Hitselberger (collectively, the "Individual Defendants") possessed the power and authority to control the contents of Tower's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

IV.     **SUBSTANTIVE ALLEGATIONS**

    A.     **Background**

28.     Tower is one of the 50 largest providers of property and casualty insurance products and services in the United States.  According to Tower's 2012 annual report on Form 10-K, a substantial part of its business is focused in the Northeastern United States.

29.     Through its insurance subsidiaries, managing general agencies, and management companies, the Company offers a broad range of commercial, specialty and personal property and casualty insurance products and services to businesses in various industries and to individuals throughout the country.  The Company and its subsidiaries provide coverage for

8

many different market sectors, including non-standard risks that do not fit the underwriting criteria of standard risk carriers due to factors such as type of business, location and premium per policy.

30.     Tower operates and presents its business results through three segments: Commercial Insurance, Personal Insurance and Insurance Services.

31.     The Company's Commercial Insurance segment provides property and casualty insurance products in general commercial and specialty commercial markets, including commercial package, general liability, workers' compensation, commercial automobile, fire and allied, inland marine and commercial umbrella policies.

32.     The Company's Personal Insurance segment provides mono-line homeowner insurance, mono-line automobile insurance and ancillary personal lines coverage (renters, condo, dwelling fire, scheduled articles, umbrella and boats).

33.     The Company's Insurance Services segment generates fees from performing various aspects of insurance company functions for other insurance companies, including underwriting, claims administration, operational and technology services.

34.     Tower provides its products on both an admitted and an "excess and surplus" ("E&S") line basis.  Insurance companies providing insurance policies on an "admitted basis" are required to be licensed by the states in which they sell policies, and to offer policies using premium rates and forms that are filed with state insurance regulators.  Insurance companies providing insurance policies on an E&S basis, are not bound by most of the rate and form regulations imposed on standard market companies, allowing them the flexibility to change the coverage offered and the rate charged without the time constraints and financial costs associated with the filing process.

**B.      The Calculation and Critical Nature of Tower's Loss Reserves**

35.      Loss reserves are liabilities established by insurers and reinsurers to reflect the cost of claim payments that the insurer or reinsurer will ultimately be required to pay with respect to the insurance or reinsurance policies it has written.  Reserves are established for losses and loss adjustment expenses ("LAE"), and consist of case reserves and incurred but not reported ("IBNR") reserves.

36.      Proper loss expense reserves are vital for an insurance company – both for financial security and for the production of accurate income statements.  First, loss reserves have a significant impact on reported operating results and financial condition.  For every dollar Tower uses to establish as a loss reserve, Tower must deduct one dollar from its net income. When a company does not establish a proper loss reserve, it is misrepresenting and overstating its net income.  Loss reserves are, thus, a key metric that drives Tower's profitability.  Second, proper loss reserves help to ensure that a company is not exposed to significant, unexpected claims that it is unable to service.

37.      Tower's loss and loss adjustment expense reserves cover its anticipated liability for the payment of all losses and LAE incurred under the policies it writes.  To the extent that loss and LAE exceed Tower's loss reserves, it is required to immediately recognize the less favorable experience, and to increase loss and loss adjustment expense reserves, with a corresponding reduction in its net income in the period in which the deficiency is identified.

38.      Throughout the Class Period, Tower represented that its loss reserves and LAE were calculated using methods that took into account loss ratio estimates for the current accident year and the loss development factor selections for all accident years.  Specifically, according to Tower's amended annual report for 2012 filed on Form 10-K/A, Tower's "loss ratio estimate for

the current accident year is selected after reviewing historical accident year loss ratios adjusted for rate changes, trend, and mix of business."

39.     Given how critical Tower's loss reserves were to its financial statements and profitability, Tower's investors paid particular attention to the Company's loss reserves, analysts regularly asked management questions regarding the Company's loss reserves, and Company management highlighted Tower's loss reserves in its communications to the market.

C.     **Tower Assures its Investors that its Loss Reserves are Accurate and Conservative**

40.     Throughout the Class Period, Tower repeatedly assured securities analysts and Tower investors that it was regularly conducting "comprehensive reviews" of its loss reserves, that its loss reserves were "conservative," and that its financial statements "fully reflect[ed] current accident year profitability going forward."

41.     For example, on July 30, 2012, the Company announced the "decisive action" of taking a $42 million after tax, or $65 million pre-tax, charge to reserves in order to "address our reserve position from prior accident years."  The loss reserve charge related primarily to unfavorable developments in the Company's Commercial Insurance segment arising from changes in estimated and ultimate losses for accident years 2011 and prior.  The Company assured investors that the reserve was more than sufficient and, in fact, "fully reflect[e]d current accident year profitability."  The Company also stated that the "reserve charge should allow Tower's financial results to fully reflect current accident year profitability going forward."  Unbeknownst to investors, however, the Company's "decisive action" neither adequately "address[ed] [Tower's] reserve position," nor "reflect[ed the Company's] current accident year profitability."  Rather, the Company's reserves were still materially deficient by tens, if not hundreds, of millions of dollars.

11

42.     Analysts credited the Company's representations that this reserve charge "resolved" the "majority of [the Company's] reserve deficiencies," and applauded Tower for purportedly "becoming more conservative with not only its reserving practices, but also its accident-year picks."   Nonetheless, Tower's stock dropped $2.58 per share from $18.21 per share on July 30, 2012 to $15.63 per share on July 31, 2012, or more than 14%, reflecting how critically important the Company's loss reserves were to investors.

**D.      Tower Negotiates a Merger with Canopius Dependent on Tower's Stock Price Rebounding**

43.     During the second quarter of 2012, Tower announced that it had agreed to invest approximately $75 million to acquire a 10.7% stake in Canopius, a privately owned Lloyd's insurance holding company domiciled in Guernsey, Channel Islands.

44.      In connection with that investment, Tower entered into an agreement dated April 25, 2012, under which Canopius agreed to assist Tower with the establishment of a presence at Lloyd's of London, and granted Tower the option to combine with Canopius (the "Merger Option").

45.     On July 30, 2012, Tower announced that it had exercised the Merger Option and entered into a merger agreement with Canopius, pursuant to which Canopius would acquire all of Tower's common stock (the "Merger Agreement").   Under the terms of the Merger Agreement, Canopius would acquire the Company through a reverse triangular merger, with the Company being the acquiring entity and continuing as the surviving corporation.   Upon completion of the merger, Tower shareholders would receive a certain number of Canopius shares and $1.25 per share in cash, resulting in current Tower shareholders owning between 75-80% of the merged company.

46.     Notably, it was essential that Tower increase its stock price in order to close the Canopius merger.  As Tower executives admitted and analysts noted, "a rebound in Tower Group's stock price" was "a prerequisite for doing the [Canopius] deal as dilution at the current share price will not be as accretive for current Tower Group shareholders."

**E.      The Individual Defendants Were Highly Motivated to Close the Canopius Merger**

47.     From at least April 2011 through the end of the Class Period, Defendants focused their efforts on making Tower an attractive purchaser candidate in order to secure the Canopius merger and maximize the payouts to the Individual Defendants under the Merger Agreement.

48.     Tower recently had gone through a number of difficult years and was searching for a way to diversify and expand its business away from the Northeast in order to minimize its earnings volatility and to take advantage of certain important tax rates available to portions of its business if it were located in Bermuda.  Tower had been particularly hit hard by claims in New York, New Jersey and Connecticut arising out of both Hurricane Irene and Superstorm Sandy.  According to Defendant Lee, Superstorm Sandy alone "easily cause[d] the largest catastrophic event [in Tower's] history."  The Company believed that a merger with  Canopius would be the "transformative" change it needed to restore the Company's earnings and growth.

49.     Analysts  similarly  believed  the  Canopius  merger  was  necessary  for  the Company's turnaround.  For example, in analyst reports dated July 31, 2012 and August 10, 2012, William Blair stated that the Canopius merger could "accelerate a rebound" because it had the potential to "greatly extend Tower's reach, materially improve underwriting leverage, and enhance the company's operating structure," add "roughly 15% EPS upside," and materially lower the Company's tax rate.  A Compass Point analyst report dated March 14, 2013, was similarly upbeat about the potential Canopius merger, stating that the merger should "have a

significant impact on improving earnings," lower the Company's corporate tax rate, "increase its international business," "open the door to more investment opportunities," allow the Company to "grow at a slightly faster pace than the peer group in 2013," and prime Tower to "return to mid-double digit [return on average equity] in the near term."  Analysts at Sidoti & Company also believed that the Canopius merger would "produce a more consistent and stable earnings stream", leading to a "higher trading multiple," and "consistent and growing earnings," and that it would add "significant growth opportunities" to the Company.

50.     The Individual Defendants were also personally motivated to close the Canopius merger.  It was contemplated from the start of the Canopius merger negotiations that Tower's existing executive officers, including Defendants Lee and Hitselberger, would serve as the executive officers of the combined company.

51.     Further, pursuant to the Merger Agreement and the Company's Long-Term Equity Plan, all unvested stock options and restricted stock awards automatically vested upon the closing of the Merger.  To that end, upon the completion of the merger, Defendant Lee was paid approximately $3.4 million (from the vesting of his restricted stock), and Defendant Hitselberger received a payment of just under $700,000.

52.     In addition, in connection with the Merger, Defendants Lee and Hitselberger were entitled to change of control benefits in the event they are terminated within the 24 months following the Merger.  The estimated golden parachute payments, assuming the termination of their employment, would be $11,082,095 for Defendant Lee and $1,878,221 for Defendant Hitselberger.

14

**F.      Tower Understates its Loss Reserves**

53.     Throughout the Class Period, Defendants, in violation of Generally Accepted Accounting Principles ("GAAP") and Tower's own internal policies, failed to properly estimate its loss reserves and LAE, and recklessly under-reserved for Tower's losses.

54.     Specifically, instead of properly and "conservatively" reserving for its losses as it had repeatedly claimed, Defendants fraudulently failed to adequately reserve for losses in, among other areas, its U.S.-based commercial insurance segments, including in the Company's workers' compensation and commercial auto lines, as well as for losses associated with the expansion of Tower's insurance portfolios as a result of the Canopius Merger.

55.     By failing to adequately reserve for losses, Defendants were able to fraudulently inflate Tower's earnings and current accident-year profitability, and cause the Company's common stock to trade at an artificially inflated price.

**G.      Tower Successfully Closes the Canopius Merger and Continues to Understate its Loss Reserves**

56.     By failing to properly reserve for losses – thereby inflating the Company's net income – Defendants were able to artificially increase Tower's stock price.  Specifically, from the day after the merger was announced, July 31, 2012, to the day the Canopius merger closed on March 13, 2013, Tower's stock price rose from $15.63 per share to $17 per share – or more than 11%.  This stock price increase was sufficient to successfully close the Canopius merger.

57.     Defendants, however, did not stop their fraud then.  Rather, Defendants continued to understate Tower's reserves, and overstate Tower's net income, for at least an additional five months.  For example, on May 10, 2013, the Company filed its 2013 first quarter earnings results with the SEC.  These financial results reflected the Company's first financial results following the completion of the Canopius merger.  Despite the acquisition of Canopius, the Company's

reported loss and loss adjustment expenses remained relatively flat as compared to the same quarter of the prior year's reserves, increasing by only $7 million, or less than 3%.  Further, the Company took only a modest adverse reserve development, despite the fact that it made $70.9 million of additions to its reserves as it suffered losses from commercial insurance written in 2009 through 2011.  Nonetheless, Defendants again claimed that Tower took a "cautious view" and "conservative approach" to its reserves, and assured investors that it had adopted – and its U.S. businesses were adhering to – "a very, very stringent reserving philosophy."

58.     Analysts credited Defendants' assurances, believing that "the chance of another reserve charge the size of [the $42 million] second quarter 2012" reserve charge was "very small," and that Tower's "accident year 2012 [wa]s developing better than expected following reserve additional made last year."  These false and misleading statements regarding the Company's loss reserves caused the Company's stock price to continue to artificially rise.

59.     Less than two months later, the Company was forced to admit that – contrary to its Class Period representations – its loss reserves were deficient, and that it would likely need to take an unexpected reserve increase of $60 million to $110 million, pre-tax.

## V.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS

### A.     Defendants' False and Misleading First Quarter 2011 Statements

60.     On May 9, 2011, Tower issued a press release after the close of the markets discussing its first quarter 2011 financial results.  The Company reported operating income of $20.3 million, diluted operating earnings of $0.49 per share, and net income attributable to common shareholders of $25.7 million, or $0.61 per diluted share.

61.     Commenting on the Company's strong first quarter 2011 results, Defendant Lee stated that the Company "continue[s] to demonstrate strong operating fundamentals and positive

trends," and "continue[s] to maintain a favorable loss ratio. . . . Based on these strong operating fundamentals and positive trends this quarter, we are confident in our outlook for the remainder of 2011."

62.     On May 10, 2011, Tower filed its quarterly report for the first quarter of 2011 on Form 10-Q with the SEC signed by, among others, the Individual Defendants. The Form 10-Q reported net premiums earned of $379.8 million, loss expenses of $240.2 million, and net income of $26.5 million.

63.     With respect to its loss and loss adjustment expenses, the Company reported:

> The net loss and LAE ratio for the first quarter of 2011 was 62.8% excluding the Reciprocal Exchanges, and 97.0% for the same period in the prior year. The net loss ratio for the Reciprocal Exchanges was 52.4% for the first quarter 2011. Excluding the Reciprocal Exchanges, there was $0.7 million in favorable development attributable to prior years comprised of $3.6 million of unfavorable development in property lines offset by $4.3 million of favorable development in liability lines. In the Reciprocal Exchanges, there was $6.2 million in favorable development attributable to prior years.

64.     In the Form 10-Q, Lee and Hitselberger also signed a SOX Certification that falsely stated that Tower's first quarter 2011 10-Q did not contain any false or misleading statements or omit to state any fact necessary to make statements made not misleading, and that the statements fairly presented the financial condition and results of operations, and that Tower's financial statements were prepared in accordance with GAAP.

**B.     Defendants' False and Misleading Second Quarter 2011 Statements**

65.     On August 8, 2011, Tower issued a press release discussing its second quarter 2011 financial results.  The Company reported operating income of $26 million, diluted operating earnings of $0.63 per share, and net income available to common shareholders of $24.1 million, or $0.58 per diluted share.  The Company also reported that its gross premiums

written increased by 41.1% to $468 million, and that the Company's net expense ratio improved by 32.9% to $31.8 million.

66.     Commenting on the Company's second quarter 2011 financial results, Defendant Lee noted that despite the "significant industry catastrophe losses and challenging market conditions" caused by severe weather conditions, Tower was "generat[ing] strong operating results," and that the Company "expect[ed its] operating results for the second half of the year to continue to improve."

67.     On August 9, 2011, Tower filed its quarterly report for the second quarter of 2011 on Form 10-Q with the SEC signed by, among others, the Individual Defendants.  The Form 10-Q reported net premiums earned of $393.5 million, loss expenses of $240.8 million, and net income of $28.3 million.  With respect to its loss and loss adjustment expenses, the Company reported a consolidated net loss ratio, including Reciprocal Exchanges, of 61.2% and of 62.4%, excluding the Reciprocal Exchanges.

68.     In the Form 10-Q, Lee and Hitselberger also signed a SOX Certification that falsely stated that Tower's second quarter 2011 10-Q did not contain any false or misleading statements or omit to state any fact necessary to make statements made not misleading, and that the statements fairly presented the financial condition and results of operations, and that Tower's financial statements were prepared in accordance with GAAP.

**C.     Defendants' False and Misleading Third Quarter 2011 Statements**

69.     On November 7, 2011, Tower issued a press release discussing its third quarter 2011 financial results.  The Company reported a net loss attributable to common shareholders of $16.4 million or ($0.40) per diluted share, and net income attributable to common shareholders of $28.6 million, or $0.66 per diluted share.  The Company also reported a net operating loss of

$15.3 million, or ($0.38) per diluted share, which including catastrophe losses from Hurricane Irene of $60.1 million ($39.1 million after-tax, or $0.96 per diluted share).

70.     With regard to its loss reserves, the Company announced that – as a result of the Company's regular review of reserves – it had recorded a pretax net increase to loss reserves of $9.6 million ($6.3 million after-tax, or $0.15 per diluted share) as a result of increases in the Company's Commercial segment of $23.5 million, partially offset by favorable developments in the Company's Personal segment of $13.8 million.  The pre-tax net increase to loss reserves included $10.7 million in increases from certain programs that the Company discontinued in 2010 and early 2011.

71.     Commenting on the Company's third quarter 2011 financial results, Defendant Lee noted that Hurricane Irene "led to [Tower's] first quarterly loss since going public in 2004." He also stated that the Company had "conducted a comprehensive review of [its] loss and loss expense reserves, including the reserves of the companies that [it] acquired during the last few years," and that based on this review, Tower had "made an adjustment to [its] reserves to reflect adverse developments in commercial lines, including certain discontinued program business, which was partially offset by a release in reserves from the personal lines business."  Despite these losses and the Company's need to increase its reserves, Defendant Lee stated that the Company "continue[d] to see great strength in our core business,", and that it "expect[ed] to generate strong organic growth for the remainder of this year and throughout next year."

72.     On November 8, 2011, Tower filed its quarterly report for the third quarter of 2011 on Form 10-Q with the SEC signed by, among others, the Individual Defendants.  The Form 10-Q reported net premiums earned of $413.4 million, loss expenses of $310 million, and a net loss of $11.9 million.

73.     With respect to its loss and loss adjustment expenses, the Company reported:

The consolidated net loss ratio, which includes the Reciprocal Exchanges, was 75.0% and 66.7 % for the three and nine months ended September 30, 2011, respectively. Excluding the Reciprocal Exchanges, the net loss ratio was 77.6% and 68.5% for the three and nine months ended September 30, 2011, respectively. The Reciprocal Exchanges' net loss ratio was 54.5% and 53.3% for the three and nine months ended September 30, 2011, respectively.

Excluding the Reciprocal Exchanges, the net loss and loss adjustment expenses included $60.1 million and $82.3 million for the three and nine months ended September 30, 2011, respectively, from claims related to severe weather related events. . . . Excluding these severe weather related events, the net loss ratio for Tower, excluding the Reciprocal Exchanges, would have been 60.6 % for the nine months ended September 30, 2011.

74.     In the Form 10-Q, Lee and Hitselberger also signed a SOX Certification that falsely stated that Tower's third quarter 2011 10-Q did not contain any false or misleading statements, or omit to state any fact necessary to make statements made not misleading, and that the statements fairly presented the financial condition and results of operations, and that Tower's financial statements were prepared in accordance with GAAP.

**D.     Defendants' False and Misleading Fourth Quarter 2011 and 2011 Year-End Statements**

75.     On February 27, 2012, Tower issued a press release discussing its fourth quarter and annual 2011 financial results.  The Company reported net income available to common shareholders of $26.8 million, and diluted earnings per share of $0.67 for the fourth quarter of 2011, and net income available to shareholders of $60.2 million, or $1.47 per diluted share for the full 2011 year.  The Company also reported operating income of $25.0 million and operating earnings per share of $0.63 for the fourth quarter of 2011, and operating income of $56.0 million, and operating earnings per share of $1.37, for the full 2011 year.  The full year operating income results including significant after-tax catastrophe storm losses.

76.     Commenting on the Company's fourth quarter and full year 2011 financial results, Defendant Lee noted that, while Tower was "disappointed with the negative impact on [its] earnings due to the losses from Hurricane Irene and other severe weather related events," it was "otherwise pleased with our overall operating results and encouraged by the progress that [it] made with regard to some of our long term business objectives."

77.     On February 29, 2012, the Company filed with the SEC its annual report for the period ending December 31, 2011 on a Form 10-K, signed by, among others, the Individual Defendants, and reported net premiums earned of $1.593 billion, loss and loss adjustment expenses of $1.055 billion, and net income of $72.1 million.  The Company also reported comprehensive income of $91.5 million, or $1.47 per diluted share, and total loss reserves of $1.3 billion.

78.     Tower also reported that it established reserves for incurred losses that are unpaid, including reserves for claims and loss adjustment expenses "after considering all information known to [it] as of the date they are recorded."  To set their loss reserves, Tower represented that it "utilize[s] information from [its] pricing analyses, actuarial analysis of claims experience by product and segment, and relevant insurance information such as loss settlement patterns for the type of business being reserved," and that when "additional information becomes available" it "revise[s] reserves for losses and loss expenses."

### E.     Defendants' False and Misleading First Quarter 2012 Statements

79.     On May 7, 2012, Tower issued a press release discussing its first quarter 2012 financial results.  The Company reported net income available to common shareholders of $20.6 million and diluted earnings per share of $0.52.  The Company also reported operating income of $21.9 million and operating earnings per share of $0.56.  With regard to its loss reserves, the

Company stated that its quarterly financial results included an after-tax charge of $8.4 million associated with prior year reserve.

80.     Commenting on the Company's first quarter 2012 financial results, Defendant Lee noted that Tower "expect[ed its] operating results and return on equity to continue to improve throughout the remainder of 2012 and beyond" as a result of "improvement in [Tower's] core business in the United States and the opportunities from [its] transaction with Canopius."

81.     On May 10, 2012, the Company filed a quarterly report for the period ended March 31, 2012 on a Form 10-Q with the SEC signed by, among others, the Individual Defendants.  The Form 10-Q reported net premiums earned of $420 million, loss expenses of $267 million, and net income of $29.6 million or $0.53 per diluted share.

**F.     Defendants' False and Misleading Second Quarter 2012 Statements**

82.     On July 30, 2012, Tower issued a press release announcing that it had entered into the Merger Agreement with Canopius, and providing an estimate of its second quarter 2012 operating results, including a reserve adjustment of $42 million after-tax.  With respect to the reserve adjustment, the Company stated that it had "conducted a comprehensive review of its reserves in the second quarter," and that the $42 million reserve adjustment "should allow Tower's financial results to fully reflect current accident year profitability going forward."  The Company further assured investors that, "[t]his reserve charge should allow Tower's prospective financial results to fully reflect current accident year profitability going forward."

83.     In the press release, the Company claimed that its "comprehensive" reserve review involved conducting "detailed reserve studies for all lines using loss data through the first quarter of 2012 as well as reported claims during the second quarter, including analysis of the source of unusually high reported loss emergence for certain casualty lines, primarily workers'

compensation and commercial automobile, observed during the first quarter of 2012."   And, based on its "comprehensive review," including "analysis of additional loss data through the second quarter of 2012," the Company claimed that its "loss emergence for the second quarter [wa]s consistent with expectations implied by the increased level of carried reserves."

84.    Commenting on the reserve charge, Defendant Lee stated:

… [W]e conducted a <u>comprehensive analysis</u> of our prior accident year reserves and reviewed our underwriting and pricing of current accident year business. Based on these reviews, we strengthened our prior accident year reserves to address recently observed higher than expected loss emergence primarily on business that we have been terminating for the last several years. . . . <u>We believe we have taken decisive actions to address our reserve position from prior accident years, and our ongoing results should better reflect the underwriting profitability of our ongoing business.</u> Our guidance for the remainder of 2012 and 2013 reflects the strength of our ongoing business.

85.    A few days later, on August 6, 2012, Tower issued a press release discussing its second quarter 2012 financial results.  The Company reported net loss attributable to common shareholders in the second quarter of 2012 of $15.1 million, or ($0.39) per diluted share, and net income attributable to common shareholders in the second quarter of 2011 of $24.1 million, or $0.58 per diluted share.

86.    With respect to its loss reserves and loss adjustment expenses, Defendant Lee again repeated that during the second quarter, the Company had "conducted a comprehensive review of our prior accident year and strengthened our prior accident year reserves," and taken "<u>decisive actions to address our reserve position from prior accident years, so that our future results should better reflect the underwriting profitability of our ongoing business.</u>"  Defendant Lee also assured investors that based on, among other things, the Canopius merger and the "actions that we have taken this quarter with respect to our reserve position," the Company had "<u>a positive outlook for the remainder of 2012 and 2013.</u>"

87.     On August 8, 2012, Tower filed its quarterly report for the second quarter of 2012 on Form 10-Q with the SEC signed by, among others, the Individual Defendants.  The Form 10-Q reported net premiums earned of $460 million, loss expenses of $349.7 million, and a net loss of $18.3 million, or $0.39 per diluted share.   With respect to its loss and loss adjustment expenses, the Company reported:

> The consolidated net loss ratio, which includes the Reciprocal Exchanges, was 76.0% and 61.2% for the three months ended June 30, 2012 and 2011, respectively.   Excluding the Reciprocal Exchanges, the net loss ratio was 77.3% and 62.4% for the three months ended June 30, 2012 and 2011, respectively.   The Reciprocal Exchanges' net loss ratio was 63.3% and 53.0% for the three months ended June 30, 2012 and 2011, respectively.

> Incurred losses and LAE for the three months ended June 30, 2012 attributable to insured events of prior years were $59.0 million. Excluding the Reciprocal Exchanges, the incurred losses and LAE from prior accident years were $65.0 million.   Excluding the Reciprocal Exchanges, there was net adverse loss development of $62.1 million in the Commercial Insurance segment and $2.9 million in the Personal Insurance segment for the three months ended June 30, 2012.

88.     In the Form 10-Q, the Company also reiterated that as a result of a "comprehensive review of its loss reserves in the second quarter," it had strengthened its prior accident year reserves by $42 million, after tax.

89.     In the Form 10-Q, Lee and Hitselberger also signed a SOX Certification that falsely stated that Tower's second quarter 2012 10-Q did not contain any false or misleading statements or omit to state any fact necessary to make statements made not misleading, and that the statements fairly presented the financial condition and results of operations, and that Tower's financial statements were prepared in accordance with GAAP.

## G.     Defendants' False and Misleading Third Quarter 2012 Statements

90.     On November 7, 2012, Tower issued a press release discussing its financial results for the third quarter 2012.  In the press release, Defendant Lee discussed the impact of

Superstorm Sandy on the Company's loss reserves, which he considered the "largest catastrophic event in the Company's history":

> While it is premature to estimate the full extent of our insured losses [from Superstorm Sandy], we are confident that our capital position for the year will not be materially impaired based on the claims reporting pattern thus far, our underwriting profile and robust reinsurance program, which was substantially strengthened after Hurricane Irene last year.

91.    The next day during the Company's investor earnings conference call, Defendant Lee stated that "[t]he third quarter 2011 numbers had the effects of Hurricane Irene and some loss reserve strengthening, while this year's third quarter results had no catastrophe losses or reserve strengthening."

92.    In response to an analyst question during the conference call regarding the Company's loss reserves, Hitselberger confirmed that the Company had made no changes to its loss reserve during the third quarter:

> No [we did not change the loss reserve], I think we had mentioned that. You'll see in the - when the Q gets filed. I think by segment, there was a net. So I think either one segment had a charge of $200,000, the other segment had a reserve release of $220,000. So I think overall, our development was - it was less than $10,000 or $20,000.

93.    On November 9, 2012, Tower filed its quarterly report for the third quarter of 2012 on Form 10-Q with the SEC signed by, among others, the Individual Defendants. The Form 10-Q reported net premiums earned of $430.7 million, loss expenses of $256 million, and net income of $25.4 million, or $0.56 per diluted share. The Form 10-Q also reported net operating income of $23.8 million, or $0.62 per diluted share, compared with operating loss of $15.3 million, or ($0.38) per diluted share during same period the prior year, and total revenue of $474.9 million, up 4.3% year over year. The Company stated that the growth was primarily attributable to increased net premiums earned during the quarter.

94.     In the Form 10-Q, the Company reported a relativity flat loss and LAE reserve adjustment, despite the fact that it had recorded an adverse development of $60 million in the prior quarter, and was moving toward completing the Canopius merger.

**H.     Defendants' False and Misleading Fourth Quarter 2012 and Full Year 2012 Statements**

95.     On February 25, 2013, Tower issued a press release announcing its fourth quarter 2012 and year-end 2012 earnings results.  The Company reported a fourth quarter 2012 net loss of $52.1 million or ($1.36) per share, compared to fourth quarter 2011 net income of $25.3 million, or $0.64 per diluted share.  For the full year 2012, the net loss attributable to common shareholders was $28.2 million, or ($0.73) per share, compared to full year 2011 net income of $60.5 million or $1.48 per diluted share.

96.     The Company also reported total revenue of $475.0 million, up 4.4% year over year.  The growth was primarily attributable to increased net premiums earned.  Gross premiums written were reported at $481.2 million, up 10.8% year over year.  Net investment income was $30.1 million compared to $32.1 million in the year-ago quarter.

97.     Tower's fourth quarter and full year 2012 results included losses of $80.1 million, or ($2.09) per diluted share, as a result of Superstorm Sandy.  Despite these losses, Defendant Lee again put a positive spin on the Company's business prospects, stating: "Tower is also progressing well with our proposed merger transaction with the Bermuda reinsurance business of Canopius.... As a result of our progress in advancing our long-term strategy, including the Canopius transaction, as well as the positive signs we are observing in the marketplace, we believe we are on track to return to profitability in 2013."

98.     The next day, in response to an analyst question on the Company's investor earnings conference call, Hitselberger told investors that the Company had no need to increase its loss reserves:

> No, the overall development for both segments was basically 0 for the quarter. And it was, again, it was 0 for the entire second half of the year since we took that reserve charge.

99.     On March 4, 2013, Tower filed its 2012 annual report on Form 10-K with the SEC, signed by, among others, the Individual Defendants.  The 2012 Form 10-K reported a $1.72 billion loss of net premiums earned, loss adjustment expenses of $1.25 billion, and a net loss of $28.1 million, or ($0.73) per diluted share.

100.    In the 2012 Form 10-K, the Company stated that, as of December 31, 2012, the Company estimated that the loss reserves established for the prior year, as of December 31, 2011, had a $69.3 million deficiency, as compared to the original net liability estimated at December 31, 2011.   In other words, Defendants knew that the Company's loss and loss adjustment reserve practices were inadequate and that it had under-reserved in 2011. Nonetheless, the Company estimated its net reserves to be $1,398.9 million for 2012, only about 1.2% more than the 2011 net re-estimate reported in the 2012 10-K, despite the fact that the Company's gross premiums written were reported at $481.2 million, up 10.8% from the prior year, and the Company was to complete the Canopius merger in the next reporting period.

101.    In the 2012 Form 10-K, the Company also explained its policies for establishing loss and LAE reserves.  Among other things, the Company stated that – pursuant to internal policies and GAAP – it is:

> [R]equired to establish reserves for incurred losses that are unpaid, including reserves for claims and loss adjustment expenses, which represent the expenses of settling and adjusting those claims.  These reserves are balance sheet liabilities representing estimates of future amounts required to pay losses and loss expenses for insured and/or reinsured claims that have occurred at or before the balance

sheet date, whether already known to us or not yet reported.   Our policy is to establish these losses and loss reserves after considering all information known to us as of the date they are recorded.

102.   With regard to reserves for reported losses, the Company claimed that it establishes a case reserve for "the estimated amount of its ultimate settlement and its estimated loss expenses," based upon "the known facts about each claim at the time the claim is reported" as soon as it receives a claim.   The Company also stated that it "subsequently increase[s] or reduce[s] the case reserves" based upon the development of additional facts about the claim.

103.   With regard to incurred but not reported reserves ("IBNR"), the Company claimed that it "establish[es] reserves for loss and loss adjustment expense ("LAE") amounts incurred but not yet reported, including expected development of reported claims."   To calculate the IBNR reserve, the Company purportedly uses "generally accepted actuarial techniques."

104.   The Company also claimed that it "closely monitors" and "reviews" its loss reserves:

> Reserves are closely monitored and are recomputed periodically using the most recent information on reported claims and a variety of statistical techniques. Specifically, on at least a quarterly basis, we review, by line of business, existing reserves, new claims, changes to existing case reserves and paid losses with respect to the current and prior years.

105.   On March 13, 2013, the Company filed with the SEC a Form 10-K/A, signed by, among others, the Individual Defendants.   The Form 10-K/A repeated in substantially similar language the information stated in ¶¶99-104 above.

106.   In the 2012 Form 10-K and Form 10 K/A, Defendants Lee and Hitselberger also signed a SOX Certification that falsely stated that Tower's 2012 Form 10-K did not contain any false or misleading statements or omit to state any fact necessary to make statements made not misleading, and that the statements fairly presented the financial condition and results of operations, and that Tower's financial statements were prepared in accordance with GAAP.

I.     **Defendants' False and Misleading First Quarter 2013 Statements**

107.    In a press release dated May 8, 2013, Defendant Lee claimed that "Tower is off to a strong start in 2013, marked by solid financial performance in the first quarter and the successful completion of our transformational merger," and that "[w]ith our new and improved business model resulting from the Canopius Bermuda merger, we are well positioned to continue making progress in successfully implementing our long-term business plan, including achieving higher returns in the remainder of 2013 and beyond."

108.    On May 9, 2013, Tower held a conference call with investors.  During this call, Defendant Hitselberger claimed that Tower had taken a "cautious view" and "conservative approach to reserving for the 2013 accident year," and that the 2012 accident year was actually "developing better than our original expectations."  Similarly, Defendant Lee assured investors that it had adopted – and its U.S. businesses were adhering to – "a very, very stringent reserving philosophy."

109.    On May 10, 2013, Tower filed its first quarter 2013 results on Form 10-Q with the SEC signed by, among others, the Individual Defendants.  The Form 10-Q reported net premiums earned of $420.4 million, loss expenses of $274.6 million, and net income of $3.8 million, or $0.33 per diluted share.  Tower also reported that revenue rose 1.89% to $475.28 million from the year-earlier quarter.  Adjusted earnings per share increased 14.29% to $0.56 per share in the quarter versus EPS of $0.49 in the year-earlier quarter.  By that measure, the Company beat the mean analyst estimate of $0.54 per share and beat the average revenue estimate of $415.48 million.

110.    Despite the fact that the Company's gross premiums written and managed increased 18%, driven primarily by growth in assumed business of $56.8 million, the Company

only minimally increased (by less than 3%) its loss and LAE reserves compared to the same quarter in the prior year.

111.    On March 13, 2013, Tower announced the closing of the Canopius merger.  In connection with the merger, Defendant Lee stated:

> After working diligently on the merger with Canopius Bermuda for more than one year, we are very pleased with the successful completion of this <u>transformative and strategically important transaction</u>. We expect this merger to be immediately accretive and to eventually allow us to achieve our long-term ROE target of 13 to 15%.  From a strategic standpoint, we believe this merger will position Tower to build a profitable, diversified international specialty business that has the potential to create substantial long-term value for our stockholders.

112.    In the Form 10-Q, Defendants Lee and Hitselberger also signed a SOX Certification that falsely stated that Tower's first quarter 2013 10-Q did not contain any false or misleading statements or omit to state any fact necessary to make statements made not misleading, and that the statements fairly presented the financial condition and results of operations, and that Tower's financial statements were prepared in accordance with GAAP.

113.    The statements set forth above in ¶¶60-112, were false and misleading for at least the following reasons:

    i.      Tower under-reserved its loss and LAE by at least $60 - $110 million;

    ii.     Tower misrepresented its income and earnings in violation of GAAP;

    iii.    Tower omitted to disclose that the goodwill impacted by reserve adjustments was impaired;

    iv.     Tower omitted to disclose that it did not properly account for the tax benefits generated by the losses in the Company's U.S. operations; and

v.      Tower lacked necessary internal controls over the Company's financial

reports.

VI.    **THE TRUTH EMERGES**

114.    On August 7, 2013, the Company issued a press release announcing that it was

postponing the release of its financial results for the second quarter of 2013, as well as its

previously scheduled conference call to discuss the results.   The Company claimed that

additional time was needed as a result of the changes in the Company's operating and reporting

segments and updates to its internal controls in the second quarter of 2013 in light of the Merger.

Specifically, the Company stated that:

> [M]anagement concluded that additional time is needed to review matters relating
> to the estimate of its loss reserves and, primarily due to the integration of the
> Canopius Bermuda merger, its allocation of goodwill and certain tax accounts.
> The Company is working to resolve these matters with the assistance of outside
> professionals. The Company cannot currently predict the length of time of its
> review.

115.    Notably, however, the Company had already issued a first quarter earnings report,

which purported to include the combined Company's operating results post-Merger.

116.    Following this news, the price of Tower shares dropped $5.20 per share, or from

$21.61 per share on August 7, 2013 to $16.41 per share on August 8, 2013, or a more than 24%

drop.

117.    The next day, August 8, 2013, the Company published a press release expanding

further upon the delay in filing its quarterly report, and suddenly disclosing that the Company

would likely need to record an adverse reserve development of $60 million to $110 million pre-

tax, and that it had hired an independent actuarial firm to review selected areas of its loss

reserves as of June 30, 2013:

> Loss reserves. The Company has retained an independent actuarial firm to review
> selected areas of the Company's loss reserves as of June 30, 2013. This review

process by an independent actuarial firm is typically conducted at year-end, but the Company will use the report of the outside actuarial firm in connection with establishing its loss reserves as of June 30, 2013.  Based upon currently available information, the Company could record adverse reserve development of $60 million to $110 million pre-tax.

Taxes. Losses in the Company's U.S. operations are generally offset by a tax benefit of 35% of such loss. Based upon currently available information, the Company expects that 60% of anticipated losses from adverse loss reserve development will come from its U.S.-taxed businesses. The expected tax benefit from such U.S. losses will not be realized in the second quarter, but will only be recognized if the Company generates additional earnings in its U.S. businesses. The Company would use any such tax benefits to offset future U.S. taxable earnings and capital gains from the anticipated rebalancing of the Company's fixed income investment assets consistent with its new corporate structure.

Goodwill The Company revised its segment reporting in the second quarter of 2013 to reflect the changes to its corporate structure after the merger with Canopius Bermuda.  As a result of this change in segment reporting, goodwill has been allocated to each business segment.  To the extent that the loss reserve adjustment adversely impacts one segment, goodwill associated with that segment may be impaired, and a non-cash charge for such goodwill would be recorded. This analysis and charge, if any, will be calculated upon the completion of the reserve review.

Net Income. …The Company will not record any tax benefit during the quarter to offset the anticipated losses in the U.S. The Company believes that at a reserve adjustment of $60 million, it would record operating earnings of between $.15 and $.20 per share, including a deferred tax valuation allowance of between $.35 and $.40 per share, and at a charge of $110 million its operating loss would be between $.80 and $.85 per share, including a deferred tax valuation allowance of between $.18 and $.23 per share. These estimates exclude the non- cash effect of any goodwill impairment.

118.    With regard to the timing for the release of the Company's second quarter results, Tower stated that it expected to announce its results within 30 days.

119.    The increases in Tower's loss reserves (assuming a $110 million pre-tax reserve development) would be 69% greater than the reserve adjustment it took in its second quarter operating results in 2012.

120.    Following this news, the price of Tower shares dropped an additional 19 cents per share, or from $16.41 per share on August 8, 2013 to $16.22 per share on August 9, 2013, or a 1.16% drop, for a total two-day drop of more than 25%.

121.    Then, on August 12, 2013, the Company filed a Form NT 10-Q with the SEC, signed by Defendant Hitselberger, notifying the SEC that it would not be submitting its second quarter 2013 Form 10-Q on time.  In the Form NT 10-Q, the Company repeated that "additional time is needed to review matters relating to the estimate of the Company's loss reserves, and the related impact to the recoverability of its goodwill and deferred tax assets," and that the Company is working with the assistance of outside professionals, including an independent actuarial firm, to review the Company's loss reserves.  The Form NT 10-Q also repeated that the Company anticipated that its Form 10-Q earnings statement would reflect "significant changes in results of operations from the corresponding period for the last fiscal year," due to the fact that it would need to record an adverse reserve development of $60 million to $110 million.

122.    The same day, A.M. Best Company placed under review with negative implications a number of the Company's subsidiaries.  Specifically, A.M. Best placed under negative review the financial strength rating ("FCR") of A- (Excellent) and issuer credit rating ("ICR") of "a-" of the pooled and reinsured members of the Tower US Pool.  Additionally, A.M. Best placed under review, with negative implications, the ICR of "bbb-", as well as the debt rating of "bbb-" on $142.5 million 5.00 percent senior convertible notes due 2013 of the intermediate holding company, Tower Group, Inc., and the FCR of A- (Excellent) and ICR of "a-" of CastelPoint Reinsurance Company (Bermuda).  A.M. Best's under review status "reflected Tower's previously issued press release, which announced the postponement of its financial results for the second quarter of 2013, the anticipated prior year loss reserve charge of

approximately $60 million to $110 million pre-tax, the impact on reserve leverage and the increased uncertainty as respects future reserve charges."

123.    Four days later, on August 16, 2013, the Company announced that on August 15, 2013 it had received a notification letter from the Nasdaq Listing Qualifications Department stating that because the Company has not yet filed with the SEC its Form 10-Q for the period ended June 30, 2013, it was not in compliance with the continued listing requirements under Nasdaq Listing Rule 5250(c)(1).

124.    Following this news, the price of Tower's shares dropped $0.36 per share, from $16.07 per share on August 16, 2013 to $15.71 per share on August 19, 2013, or a 2.24% drop.

125.    Prior to the market open on September 10, 2013, the Company announced that it would again need to delay the filing of its second quarter of 2013 Form 10-Q.  Specifically, the Company stated that it was "continuing its work with its independent actuarial consultants to complete the review of selected areas of the Company's loss reserves and the remaining work necessary to release its financial results and file its quarterly report on Form 10-Q for the second quarter of 2013."   The Company also stated that it would not be providing any projections regarding when it would file its second quarter of 2013 Form 10-Q, but that it "expect[ed] to announce on Tuesday, September 17, 2013, the date for its second quarter earnings release and conference call, and the date on which it expects to file its Form 10-Q."

126.    After the market closed on September 17, 2013, the last day of the Class Period, the Company announced that it intended to release its second quarter 2013 financial results during the week of October 7, 2013, and its second quarter 2013 Form 10-Q "as soon as practical after it reports its financial results."

127.    The following day, September 18, 2013, FBR Co. downgraded Tower, cutting expectations from "outperform" to "market perform", and slashed its price target from $22 to $17 per share due to the Company's further delay in releasing its 2013 second quarter Form 10-Q.  In its report, FBR Co. stated that, "[t]he company did not affirm its previous EPS guidance for 2Q13 of ($0.85) to $0.15.  Our conclusion thus is that the reserve charge, which had been estimated at $60 million to $110 million pretax, could be higher.  [A] charge that could be greater than 7% of reserves, combined with a charge of ~5% of reserves in 2012, puts the company in a weaker capital position."

128.    Following this news, the price of Tower's shares dropped $3.87 per share from $13.86 per share on September 17, 2013 to $9.99 per share on September 18, 2013, or nearly a 28% drop.

VII.    <u>SCIENTER ALLEGATIONS</u>

129.    As alleged herein, Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated in or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Tower, their control over, and receipt or modification of Tower's allegedly materially misleading statements, and their associations with the Company which made them privy to confidential proprietary information concerning Tower, participated in the fraudulent scheme alleged herein.

130.    Defendants Lee and Hitselberger were motivated to engage in this course of conduct in order to secure benefits in the Merger with Canopius.  From the start of the merger

negotiations, it was contemplated that Tower's existing executive officers, Defendants Lee and Hitselberger, would be the executive officers of the combined company. Also, pursuant to the Merger Agreement and the Company's Long-Term Equity Plan, all unvested stock options and restricted stock awards automatically vested upon the closing of the Merger. To that end, Defendant Lee was paid approximately $3.4 million (from the vesting of his restricted stock), and Defendant Hitselberger received a payment of just under $700,000.

131. In addition, in connection with the Merger, Defendants Lee and Hitselberger are entitled to change of control benefits in the event they are terminated within the 24 months following the Merger, which in total (assuming the termination of their employment) would be: Lee, $11,082,095; Hitselberger, $1,878,221.

132. The payments these defendants received or may receive strongly indicate their motivation and intent to use the Merger as a means to extract large personal payments, raising a strong inference of scienter.

## VIII.  PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

133. Throughout the Class Period, Tower common stock has traded on NASDAQ, an efficient market that promptly digested current information with respect to Tower from publicly available sources and reflected such information in the prices of Tower's shares.

134. The evidence that Tower common stock traded on an efficient market at all relevant times includes the following:

> i. Tower common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;
>
> ii. As a regulated issuer, Tower filed periodic public reports with the SEC and the NASDAQ;

iii. The average weekly trading volume during the Class Period was over 340,000 shares;

iv. During the Class Period, Tower was followed by multiple securities analysts who wrote reports about Tower that were distributed to their clients. Each of these reports were publicly available and entered the public marketplace;

v. Tower regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

vi. Tower securities were liquid and traded with moderate to heavy volume during the Class Period.

135. Based on these indicia, a presumption of reliance applies.

## IX. LOSS CAUSATION/ECONOMIC LOSS

136. By misrepresenting its financial outlook, risk exposure, and the value of its assets, Defendants presented a misleading picture of Tower's business and prospects. Instead of truthfully disclosing during the Class Period that Tower's income and earnings were being inflated through accounting techniques that violated GAAP and SEC rules, such as failing to establish adequate reserves for incurred losses and loss expenses, and failing to properly value goodwill and realize tax benefits relating to losses in the Company's operations, Defendants falsely reported Tower's financial condition and outlook.

137.     The Company's statements concerning its profitability, claims and loss reserving practices, and the fair representation of the value of the Company's assets, as described herein, caused and maintained the artificial inflation in Tower's stock price throughout the Class Period, until the truth was revealed to the market.

138.     Defendants' false and misleading statements had the intended effect and caused Tower's stock to trade at artificially inflated levels throughout the Class Period.

139.     As alleged herein, the truth about Tower's overstatement of its financial condition and outlook emerged in a series of partial disclosures between August 7, 2013 and September 17, 2013.  On these partial disclosures, the Company's stock price dropped over 36%, from $21.61 per share at the close of business on August 7, 2013 to $9.99 per share at the close of business on September 18, 2013.

## X.      NO SAFE HARBOR

140.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements described in this Complaint.   Many of the specific statements described herein were not identified as "forward-looking" when made.   To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described herein, defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false, and/or that the forward-looking statement was authorized and/or approved by an executive officer of Tower who knew that those statements were false when made.

38

## XI.    CLASS ACTION ALLEGATIONS

141. Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Tower common stock during the period May 10, 2011 through and including September 17, 2013 (the "Class"), and who were damaged thereby.  Excluded from the Class are Defendants, other officers and directors of Tower at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

142.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Tower common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Tower or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

143.    The disposition of the claims in a class action will provide substantial benefits to the parties and the Court.  At all relevant times, Tower had over 38 million shares of stock outstanding, which were owned publicly by at least hundreds of persons and entities.

144.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- • whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Tower;

- whether the Individual Defendants caused Tower to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Tower common stock during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

145.    Plaintiff's claims are typical of the claims of the other members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal law that is complained of herein.

146.    Plaintiff will adequately protect the interests of the Class and has retained competent counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

147.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## <u>COUNT ONE</u>
### For Violation of § 10(b) of the Exchange Act
### and Rule l0b-5 Against All Defendants

148.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

149.    Plaintiff asserts this Count pursuant to § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against Defendants Tower, Lee and Hitselberger.

150.     During the Class Period, Defendants disseminated or approved the false statements set forth above, which they knew or deliberately disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

151.     Defendants violated § l0(b) of the 1934 Act and Rule 10b-5 in that they:

a.      employed devices, schemes and artifices to defraud;

b.      made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c.      engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Tower common stock during the Class Period.

152.     By virtue of their positions at Tower, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

153.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior executive managers and/or directors of Tower, the Individual Defendants had knowledge of the details of Tower's internal affairs.

154.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Tower.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Tower's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Tower securities was artificially inflated throughout the Class Period.   In ignorance of the adverse facts concerning Tower's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Tower securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

155.    Plaintiff and the other members of the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Tower common stock.  Plaintiff and the other members of the Class would not have purchased Tower common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

**COUNT TWO**
**For Violation of §20(a) of the Exchange Act**
**Against the Individual Defendants**

156.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

157.    Plaintiff asserts this Count pursuant to Section 20(a) of the Exchange Act against the Individual Defendants.

158.    The Individual Defendants, by virtue of their executive leadership positions in Tower, had the power and authority to cause Tower to engage in the wrongful conduct complained of herein, and to control the contents of Tower's annual and quarterly reports and press releases.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.

159.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Tower's financial condition and results of operations, and to correct promptly any public statements issued by Tower which had become materially false or misleading.

160.    Because of their positions of control and authority as senior executive officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Tower disseminated in the marketplace during the Class Period concerning Tower's results of operations.  Each of the Individual Defendants exercised control over the general operations of Tower, and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.  The Individual Defendants therefore, were "controlling persons" of Tower within the

meaning of Section 20{a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Tower securities.

161.    Tower violated Section 10(b) and Rule l0b-5 by its acts and omissions as alleged in the Complaint, and as a direct and proximate result of those violations, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

162.    By reason of their control of Tower, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for Tower's violations of Section 10(b) and Rule l0b-5, to the same extent as Tower.

## XII.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.    Awarding Plaintiff and the other members of the Class damages, including interest;

C.    Awarding Plaintiff reasonable costs and attorneys' fees; and

D.    Awarding Plaintiff such other or further relief as the Court may deem just and proper.

## XIII.    **JURY DEMAND**

Plaintiff, on behalf of the Class, hereby demands a trial by jury.

Dated: October 4, 2013

**LAW OFFICES OF CURTIS V. TRINKO, LLP**

By: _____

Curtis V. Trinko (CT-1838)
Jennifer E. Traystman
C. William Margrabe
16 West 46th Street, 7th Floor

New York, NY 10036
Tel:  (212) 490-9550
Fax:  (212) 986-0158
Email:  Ctrinko@trinko.com

**Ryan & Maniskas, LLP**
Katharine M. Ryan
Richard A. Maniskas
995 Old Eagle School Rd., Ste. 311
Wayne, PA 19087
Tel:  (484) 588-5516
Fax:  (484) 450-2582

*Counsel for Plaintiff*

**CERTIFICATION**

I, _SANJU SHARMA_ , ("Plaintiff") declare, as to the claims asserted under the federal securities laws that

1.      Plaintiff has reviewed the complaint and authorizes its filing.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, including providing testimony at deposition or trial, if necessary.  I understand that is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4.      Plaintiff's purchase and sale transaction(s) in the **Tower Group International, Ltd. (NASDAQ: TWGP)** security that is the subject of this action during the Class Period is/are as follows:

PURCHASERS                                    SALES

| Buy Date | Shares | Price per Share | | Sell Date | Shares | Price per Share |
|----------|--------|-----------------|---|----------|--------|-----------------|
| 08/07/2013 | 1000 | $21.61 | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

(Please list additional purchase and sale information on a separate sheet of paper, if necessary)

5.      Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including Plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

6.      During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws, except as described below_____N/A_____.

7.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _2nd_ day of _October_, 2013.

_____
Signature

_SANJU SHARMA_
Print Name